IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 4, 2023 Session

## CORY FULGHUM v. STAN NOTESTINE

**Appeal from the Circuit Court for Rutherford County**
**No. 75797     Darrell Scarlett, Judge**

_____

**No. M2022-00420-COA-R3-CV**
_____

The Plaintiff brought a premises liability claim after falling off his own ladder while at the Defendant's residence. The Defendant moved for summary judgment, arguing he had no duty to warn and could avoid liability under principles of comparative fault. The Plaintiff countered that the Defendant was actually his employer and that the Defendant's decision not to provide workers' compensation insurance prevented the Defendant from being able to raise a comparative fault defense. Furthermore, the Plaintiff argued that the Defendant did have a duty to warn. The trial court granted the Defendant summary judgment finding no duty to warn and that even if a duty existed that Plaintiff's claim failed as a matter of law based upon comparative fault principles. The Plaintiff appealed to this Court. We affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Michael Anthony Jones, Murfreesboro, Tennessee, for the appellant, Cory Fulghum.

Donald Andrew Saulters, Nashville, Tennessee, for the appellee, Stan Notestine.

## OPINION

An unfortunate accident resulted in a serious injury and a dispute between two best friends, Cory Fulghum and Stan Notestine. Mr. Fulghum is an accomplished carpenter by trade who possesses skills in hanging and trimming wooden structures.[1] He is also a

---

[1] Independent of his carpentry work, Mr. Fulghum also worked for a moving truck company during the pendency of this litigation.

licensed general contractor in Tennessee for commercial, industrial, and residential projects.[2]  Mr. Notestine is a truck driver.  Both parties agree that Mr. Notestine is not, nor has he ever been, a professional homebuilder.  In connection with his significant experience with trucks, Mr. Notestine has, however, honed his mechanical skills.

These self-described "best of friends" have known each other for approximately seventeen years.  Mr. Fulghum first befriended Mr. Notestine after a hailstorm when he offered to repair damaged portions of Mr. Notestine's home.  Thereafter, the two men began regularly helping each other in connection with their respective skills.  If Mr. Fulghum's car malfunctioned, for example, Mr. Notestine happily repaired it, and if Mr. Notestine's home ever needed repairs, Mr. Fulghum returned the favor.

The two friends never memorialized this informal system, nor did the men usually compensate each other.  Mr. Notestine never accepted any money in exchange for repairing Mr. Fulghum's vehicle in spite of his offers.  Sometimes Mr. Notestine "offer[ed]" Mr. Fulghum "a couple hundred dollars" if a particular task took several days to complete, such as when Mr. Fulghum tiled the master bathroom.  But usually, the two men refused to accept each other's money.  Mr. Fulghum did accept Mr. Notestine's money on one occasion about a week before the accident at issue here, when Mr. Notestine gave Mr. Fulghum one thousand dollars.  The two men disagree as to why Mr. Notestine offered that money in the first place.  Mr. Notestine described that money as "gratuitous[ly]" given, essentially as a gift to show his appreciation for Mr. Fulghum's help.  By contrast, Mr. Fulghum characterized this money as a wage "for the work that he had previously done."  The parties agreed that the friends' general approach was to informally "help each other out" as friends whenever one would benefit from the other's specialized skills.

In 2018, Mr. Notestine decided to substantially renovate his new Rutherford County residence.  He obtained a building permit;[3] he did not obtain any workers' compensation

---

[2] During his deposition, Mr. Fulghum testified that he completed his last job as a general contractor in 2004.  Though his license is "active," he said it is not "current" because he has not paid dues for a number of years.

[3] At oral argument, counsel for Mr. Notestine suggested that Mr. Notestine did not obtain a building permit for his home repairs.  Mr. Notestine argues the same in his brief: "there is no proof [in the record] whatsoever regarding a building permit."  He contends that this Court should disregard any reference to a building permit as "an assumption."  However, "Mr. Notestine admits he obtained a building permit for the work being done on his personal residence" in his Answer to First Amended Complaint.  This is a statement of fact made in a pleading to the trial court, and "[f]actual statements contained in pleadings may be considered as admissions."  *Conley v. Life Care Ctrs. of Am., Inc.*, 236 S.W.3d 713, 743 (Tenn. Ct. App. 2007) (citing *Patterson ex rel. Patterson v. Dunn*, No. 02A01-9710-CV-00256, 1999 WL 398083, at *8 (Tenn. Ct. App. June 16, 1999)); *Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. Ct. App. 1987).  Thus, we treat the existence of a building permit as admitted.

insurance. Mr. Notestine sought out a general contractor to help with the drywall, roof, siding, brick, and foundation. As usual, Mr. Fulghum offered to help Mr. Notestine with some general carpentry-related tasks. During his deposition, Mr. Fulghum acknowledged that he considered his carpentry assistance to be "work between friends." Mr. Notestine provided Mr. Fulghum with a key to the residence and some tools. Mr. Fulghum, however, confirmed that he provided most of the tools and equipment needed to complete the shiplap installation, though Mr. Notestine provided the shiplap boards.[4] Mr. Fulghum brought two of his own twenty-four-foot extension ladders with him to use at Mr. Notestine's home. Neither party has alleged that either ladder had any defects.

On May 8, 2018, Mr. Fulghum endeavored to install shiplap above Mr. Notestine's fireplace. Mr. Notestine was not at his residence when Mr. Fulghum arrived, so Mr. Fulghum let himself in using the key Mr. Notestine had previously given him. When he was asked how he knew what to do when Mr. Notestine was not present, Mr. Fulghum responded, "I'm a contractor." He added Mr. Notestine "didn't tell me how to do carpentry work, and I don't tell him how to do work on cars. So we had an understanding." Asked if "this was just work between friends," Mr. Fulghum stated "[y]eah, between the best of friends."

With regard to the shiplap installation, Mr. Notestine's fireplace is five feet wide. Under normal circumstances, Mr. Fulghum would have had to mount and dismount a ladder regularly to complete the shiplap installation. He sought to overcome this obstacle by setting up his two twenty-four-foot extension ladders side-by-side along the fireplace and about a foot apart from each other. This configuration, Mr. Fulghum thought, would allow him to "cross from one [ladder] to the other in the air," thereby maximizing his efficiency and accelerating the completion of the installation. Mr. Fulghum worried though that his ladders might harm the finish on Mr. Notestine's hardwood floors. In order to prevent any such damage, Mr. Fulghum placed individual pieces of cardboard underneath each ladder before beginning his task.

Both men agree that Mr. Notestine was not at home when Mr. Fulghum placed the ladders atop the cardboard. Mr. Notestine arrived at the home, however, before the accident. The parties disagree about what he observed. Mr. Fulghum alleges that Mr. Notestine "personally observed" that cardboard pieces lay underneath each ladder and "actively overs[aw] the work." By contrast, Mr. Notestine claims that he did not see the

---

[4] Shiplap is a particular style of wooden board. Patricia Shannon, *What is Shiplap? A Guide to the Popular Building Material*, Better Homes & Gardens (Jun. 14, 2022), https://www.bhg.com/home-improvement/walls/what-is-shiplap/. Its name derives from the significant role it played historically in boat construction. *Id.* Today, shiplap is a popular material used in interior and exterior home design. *Id.* Using shiplap on walls is a "trend [that] was popularized by Chip and Joanna Gaines' hit [television] show, 'Fixer Upper' and became a huge phenomenon." Brooke Younger, *The Shiplap Alternative Fixer Upper's Joanna Gaines Absolutely Adores*, House Digest (July 13, 2023), https://www.housedigest.com/1337970/shiplap-alternative-fixer-upper-joanna-gaines-loves-hgtv.

cardboard but rather "walked in, exchanged a brief greeting with [Mr. Fulghum], who was already on the ladder . . . [with] ear-buds in listening 'to the radio or something,'" and then attended to other projects outside. Mr. Fulghum concedes that Mr. Notestine neither suggested that the cardboard-under-ladders setup was safe nor directed Mr. Fulghum to place or maintain the cardboard underneath his ladders. Mr. Notestine said nothing about the cardboard that was under the ladders. There is no assertion that there was any defect or danger in connection with the flooring itself.

Unfortunately, the pieces of cardboard shifted under Mr. Fulghum's weight, causing the ladders to topple. Mr. Fulghum sustained serious injuries including a broken neck, a ruptured Achilles tendon, and significant scarring. The cost of his medical treatment for these injuries exceeded $350,000.

Mr. Fulghum filed a Complaint in Rutherford County Circuit Court, seeking compensation from Mr. Notestine.[5] While Mr. Fulghum did not explicitly claim at the time of filing that he enjoyed an employer-employee relationship with Mr. Notestine, he did allege that he "was working for [Mr. Notestine]" and was subject to Mr. Notestine's "direct supervision and control." Endeavoring to understand Mr. Fulghum's allegations and his claim for relief, the trial court, without objection or clarification from Mr. Fulghum, characterized his claim as tantamount to a premises liability claim.

The deposition of Mr. Notestine primarily focused upon questions regarding his status vis-à-vis Mr. Fulghum. Mr. Fulghum's counsel asked Mr. Notestine if he ever considered the two men to have been engaged in an employer-employee relationship. Mr. Notestine responded that their relationship could probably have been classified that way when it began seventeen years ago because "he was a general contractor being paid to do roof repair, siding repair and that type of stuff." But Mr. Notestine indicated that relationship had been converted into "more of a 'you help me/I help you' relationship" long before the date of the accident. When asked whether he hired a general contractor for his home repairs, Mr. Notestine said, "I was pretty much acting as my own general contractor. I was subbing some items out and doing some items myself." Mr. Notestine also testified that he did not see the cardboard until "[a]fter the fact."

Mr. Notestine filed a Motion for Summary Judgment. Therein, he argued that he owed Mr. Fulghum no duty to warn about the ladders-on-cardboard setup because it was Mr. Fulghum who situated the ladders there in the first place. Mr. Notestine argued in the alternative that, even if he did owe Mr. Fulghum a duty to warn of an allegedly dangerous condition of Mr. Fulghum's own design, Mr. Fulghum was "more than 50% at fault" and so his claim would fail under the doctrine of comparative fault.

---

[5] In addition to seeking recompense for his medical expenses, Mr. Fulghum also prayed for relief from his pain and suffering and his anticipated court costs.

Mr. Fulghum opposed the motion with a written response but also requested leave to amend his Complaint. The trial court granted that request. Thereafter Mr. Fulghum filed his First Amended Complaint and an accompanying Statement of Additional Facts. In his Statement of Additional Facts, Mr. Fulghum characterized the relationship between the two men as an employer-employee relationship. In addition to describing Mr. Notestine as his employer, Mr. Fulghum also characterized Mr. Notestine as a "construction services provider" or a "general contractor." Accordingly, Mr. Fulghum argued that Mr. Notestine should have under Tennessee law purchased workers' compensation insurance. Mr. Fulghum did not, however, seek benefits under Tennessee's Workers' Compensation Law, but instead advanced his employment-related argument in support of his contention that Mr. Notestine could not rely on his comparative fault defense in response to Mr. Fulghum's premises liability claim.[6]

In response, Mr. Notestine filed a Revised Motion for Summary Judgment, in which he objected to Mr. Fulghum's characterizations of the relationship. Mr. Notestine argued that the two men did not have an employer-employee relationship for the purposes of completing his Rutherford County residential renovation project. Mr. Notestine denied other definitional arguments that Mr. Fulghum made such as labeling Mr. Notestine as a "construction services provider" or a "general contractor." All of these assertions, Mr. Notestine argued, falter in the face of the reality, which he contends is an unfortunate accident that occurred while one friend "help[ed] his [other] friend with no expectation of compensation." At most, Mr. Notestine asserted, Mr. Fulghum qualified as nothing more than a volunteer or casual worker. Therefore, he was not obligated to purchase workers' compensation insurance, and he, accordingly, could rely upon a comparative fault defense.

The trial court heard oral arguments as to the matter of summary judgment. During that hearing, Mr. Fulghum suggested that disputes of material fact precluded a grant of summary judgment. According to him, the parties "clearly disputed facts . . . [regarding]

---

[6] Based on our review of the record and the parties' briefing, we understand Mr. Fulghum's First Amended Complaint to only reference Tennessee's Workers' Compensation Law for the limited purpose of obviating a comparative fault defense rather than raising a claim for workers' compensation benefits. "[A] plaintiff is 'master of the claim' when it comes to choosing his forum." *Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*, 229 S.W.3d 304, 305 (Tenn. Ct. App. 2007) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 387 (1987)). The circuit court would not possess subject matter jurisdiction over a "contested claim for workers' compensation benefits," given the General Assembly's decision to create a separate Court of Workers' Compensation Claims to adjudicate such cases. Tenn. Code Ann. § 50-6-237 (creating the court of workers' compensation claims and vesting it with "original and exclusive jurisdiction over all contested claims for workers' compensation benefits when the date of the alleged injury is on or after July 1, 2014"). Neither party, however, has argued or understood this matter as being a workers' compensation benefit action nor did the trial court regard it as such. Because both parties understood the complaint and have litigated this case as presenting a premises liability claim, the trial court regarded it as such, and the shared understanding of the trial court and the parties is a reasonable construction of Mr. Fulghum's First Amended Complaint, we likewise interpret Mr. Fulghum's First Amended Complaint through that lens.

- 5 -

the relationship between the parties, [and] a duty between the parties." The trial court expressed puzzlement at Mr. Fulghum's contention, pointing out that Mr. Notestine admitted all of the facts in Mr. Fulghum's statement of undisputed facts "for the purpose of summary judgment." The trial court questioned whether the existence of a duty qualifies as a factual dispute or, rather, a question of law. The trial court then asked Mr. Fulghum's counsel, "if you're telling me there's a material fact in dispute, what is it?" Mr. Fulghum's counsel responded, "I can't place my hand on it."

Following the hearing, the trial court granted Mr. Notestine's Revised Motion for Summary Judgment via its March 3, 2022 Memorandum and Order. Therein, the trial court noted the parties' longstanding friendship and how they "would help each other out with various projects as good friends often do." The trial court rejected Mr. Fulghum's contention that the terms "employer" and "employee" fit the relationship between these parties. Regarding Mr. Fulghum's argument that Mr. Notestine qualified as a "construction services provider," the trial court stated that "[t]he record . . . is devoid of any proof the Defendant is 'engaged in the construction industry' as that term is defined. The Defendant is a truck driver. Accordingly, there is no evidence . . . to show the Defendant is a 'construction services provider' within the worker's compensation law." Given the aforementioned conclusions, the trial court determined that "the provisions of the worker's compensation law do not apply, the Defendant was not required to provide worker's compensation insurance[,] and the provisions of T.C.A. § 50-6-406(b) prohibiting Defendant to allege Plaintiff was negligent, likewise, do not apply." In other words, Mr. Notestine could raise his defense of comparative fault.

With that analysis completed, the trial court turned to Mr. Fulghum's premises liability claim. The trial court agreed with Mr. Notestine's argument that property owners are "not under an obligation to discover and warn an invitee of a dangerous condition created by the invitee." Because Mr. Notestine's actual premises contained no defect, "such as a rotten floor," the trial court concluded Mr. Notestine never assumed a duty to warn. Even if he did assume such a duty, the trial court concluded that Mr. Nosetine still would not be liable because "no reasonable jury could find [Mr. Fulghum] less than 50% at fault" for his injuries. The trial court held that Mr. Notestine did not violate his general "duty to exercise reasonable care" under the circumstances. Therefore, the trial court granted Mr. Notestine's Revised Motion for Summary Judgment.

Mr. Fulghum timely appealed that grant of summary judgment, raising four issues on appeal:

1. Whether the trial court erred when it ruled the Plaintiff Cory Fulghum was not a statutory employee of the Defendant, Stan Notestine, at the time of the injury;

2. Whether the Defendant, Stan Notestine, was required to carry workers'

compensation insurance, at the time the Plaintiff, Cory Fulghum was injured;

3. Whether the court erred when it determined that the Defendant did not breach his duty of care owed to the Plaintiff; [and]

4. Whether the Court erred when [it] found that no reasonable jury can find the Plaintiff was less than fifty (50%) at fault for his injuries.

Mr. Fulghum's first and second issue on appeal are related to advancing his contention that the Mr. Notestine cannot rely upon comparative fault as a defense against Mr. Fulghum's premises liability claim because he failed to acquire purportedly required workers' compensation insurance. Mr. Fulghum's fourth issue relates to his contention that even if Mr. Notestine can raise a defense of comparative fault that summary judgment was, nevertheless, improperly granted. Mr. Fulghum's third issue is related to his contention that the trial court erred in determining that his premises liability claim failed because Mr. Notestine does not have a duty to warn.

We conclude that the trial court properly found that Mr. Notestine had no duty to warn Mr. Fulghum (issue 3); consequently, the trial court properly awarded summary judgment to Mr. Notestine. Issues 1, 2, and 4 are either connected to Mr. Fulghum's argument that Mr. Notestine cannot rely on a comparative fault defense (issues 1 & 2) or that summary judgment based on a comparative fault rationale is an inappropriate in this case (issue 4). Resolving the arguments as to these issues on appeal is ultimately unnecessary because Mr. Notestine's lack of duty to warn is dispositive of the outcome.

II.

Turning first to our standard of review, this court "review[s] a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id*. We must "view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye*, 477 S.W.3d at 250.

III.

According to Mr. Fulghum, his decision to place the two twenty-four-foot extension ladders on top of pieces of cardboard created an obvious dangerous condition. Upon Mr.

Notestine becoming aware of this obvious dangerous condition, Mr. Fulghum argues a duty was imposed upon Mr. Notestine to warn Mr. Fulghum of this danger. Because Mr. Notestine did not issue such a warning, Mr. Fulghum asserts that he has a valid premises liability claim against the premises owner Mr. Notestine. Mr. Notestine wholly rejects the contention that he owed Mr. Fulghum any duty to warn. He argues that common law principles related to premises liability claims do not impose upon Mr. Notestine an obligation to warn Mr. Fulghum of a condition that Mr. Fulghum created himself. But, Mr. Notestine says, even if a duty to warn did arise, he is not liable based upon his comparative fault defense. Mr. Fulghum counters that Mr. Notestine, because of his failure to acquire workers' compensation insurance, cannot rely upon comparative fault, and even if he can raise such a defense that it would improper in this case to grant summary judgment to Mr. Notestine on that basis. We conclude that Mr. Notestine had no duty to warn under the facts of the present case; accordingly, it is unnecessary to resolve whether the defense of comparative fault may be employed.

The Tennessee Supreme Court has observed that, in the context of a negligence claim, "[d]uty is a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm." *Grogan v. Uggla*, 535 S.W.3d 864, 871 (Tenn. 2017) (quotation omitted). In determining whether a duty exists, Tennessee courts have distinguished between misfeasance and nonfeasance and regularly employ this distinction "when called upon to decide whether a duty exists." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355-57 (Tenn. 2008).[7] Where there is

---

[7] Addressing the distinction between misfeasance and nonfeasance, the Tennessee Supreme Court in *Satterfield* observed the following:

> Professor Francis H. Bohlen asserted that "[t]here is no distinction more deeply rooted in the common law and more fundamental than that between misfeasance and non-feasance, between active misconduct working positive injury to others and passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant." While the primacy of this distinction is certainly subject to debate, that it has played a significant role in the formation of the law of negligence is beyond reasonable dispute.
>
> Professor Bohlen is not the only scholar to offer an eloquent and enlightening articulation of the distinction between misfeasance and nonfeasance. Dean Keeton and Dean Prosser explained the distinction as follows:
>
> > In the determination of the existence of a duty, there runs through much of the law a distinction between action and inaction.... [T]here arose very early a difference, still deeply rooted in the law of negligence, between "misfeasance" and "nonfeasance"—that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm. The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he

misfeasance, the Tennessee Supreme Court "has held that all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. As for nonfeasance, Tennessee's courts generally have declined to impose a duty to act or to rescue." *Id*. at 357. In other words, "persons do not ordinarily have a duty to act to protect others from dangers or risks except for those that they themselves have created." *Id*.

Here, it is undisputed that Mr. Notestine did not create the danger. While this is not a case involving misfeasance by Mr. Notestine, in the present case this does not resolve the question of whether Mr. Notestine had a duty to warn. It fails to do so because premises liability is a species of negligence under which a duty may arise from nonfeasance rather

---

has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs.

Prosser and Keeton § 56, at 373.6 Similarly, Professor Fowler V. Harper and Judge Posey M. Kime offered the following explanation:

> The man who has undertaken a definite course of continuous action thus brings himself into relation with other human beings within the zone of possible danger, to an extent requiring that precaution against bodily harm to such persons which a reasonable man under the circumstances would take. If he fails to do so, this is characterized as misfeasance. In other words, an actor is always under the duty to see that other persons are not immediately exposed to an unreasonable risk from his acts. On the other hand, a previous course of action, not in itself creating risks to others, may have brought the actor into certain socially recognized relations with others which are of such a character as to require affirmative acts to protect them from risks which the person thus required to act had no part in creating. The failure to perform such an act is described as non-feasance.

Fowler V. Harper & Posey M. Kime, The Duty to Control the Conduct of Another, 43 Yale L.J. 886, 887 (1934) . . .

The distinction between misfeasance and nonfeasance can be easily misunderstood. One can be led astray by thinking that a defendant's negligent act must be characterized "as an affirmative act for a duty to exist, rather than appreciating that it is the defendant's entire course of conduct that must constitute an affirmative act creating a risk of harm and that negligence may consist of an act or omission creating an unreasonable risk." A classic illustration of this point is the example of a driver who fails to apply his or her brakes to avoid hitting a pedestrian walking in a crosswalk. Even though the driver's negligent act— failing to apply the brakes—is an omission, the "driver's careless failure to apply the brakes is negligent driving, not negligent failure to rescue." Accordingly, distinguishing between misfeasance and nonfeasance can best be accomplished, not by focusing on whether an individual's "specific failure to exercise reasonable care is an error of commission or omission," but rather by focusing on whether the individual's entire course of conduct created a risk of harm. Thus, even though the specific negligent act may constitute an omission, the entirety of the conduct may still be misfeasance that created a risk of harm.

*Satterfield*, 266 S.W.3d at 355-57.

than misfeasance.[8]

Addressing premises liability claims, the Tennessee Supreme Court indicated that

> persons seeking to prevail against a property owner on a premises liability claim must prove the elements of a negligence claim, *and in addition*, must prove either that the condition was caused or created by the owner, operator, or his agent, or if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident.

*Parker v. Holiday Hosp. Franchising, Inc.*, 446 S.W.3d 341, 350 (Tenn. 2014) (footnote and quotation omitted). The elements of a negligence claim require the plaintiff to establish "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Satterfield*, 266 S.W.3d at 355.

Often premises liability cases focus on the property owner's duty to warn a visitor about "latent or hidden dangers," *Eaton v. McLain*, 891 S.W.2d 587, 595 (Tenn. 1994). The Tennessee Supreme Court, however, clarified in *Coln v. City of Savannah*:

> That a danger to the plaintiff was "open or obvious" does not, *ipso facto,* relieve a defendant of a duty of care. Instead, the duty issue must be analyzed with regard to foreseeability and gravity of harm, and the feasibility and availability of alternative conduct that would have prevented the harm. The factors provided in the Restatement (Second) of Torts, § 343A relate directly to the foreseeability question; in short, if the foreseeability and gravity of harm posed from a defendant's conduct, even if "open and obvious," outweighed the burden on the defendant to engage in alternative conduct to avoid the harm, there is a duty to act with reasonable care.

966 S.W.2d 34, 43 (Tenn. 1998).

---

[8] *See*, *e.g.*, *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 512 (Tex. 2022) (quotation omitted) ("Premises liability is a species of negligence that encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe."); *see also*, *e.g.*, *Batchelder v. Homes*, No. 353265, 2021 WL 5405760, at *3 (Mich. Ct. App. Nov. 18, 2021) (characterizing premises liability claims as based upon nonfeasance); *Est. of Ciotto v. Hinkle*, 145 N.E.3d 1013, 1032 (Ohio Ct. App. 2019) (same); John W. Grund, J. Kent Miller, and David S. Werber, 7 Colo. Prac., Personal Injury Torts And Insurance § 10:8 (3d ed. 2022)) (noting that "[m]any premises-liability claims arise from failure to act" and are nonfeasance based claims); Amer Lakhani, *Premises Liability and the Coronavirus: An Outline of Risks and Responsibilities*, 30 No. 6 Miller & Starr, Real Estate Newsalert NL 1 (2020) (observing that premises liability claims can be predicated on misfeasance or nonfeasance).

A review of Tennessee premise liability cases shows the dangerous condition has been created (1) by the property owner, operator, or their agent,[9] (2) by third-parties,[10] or (3) by nature itself.[11]  None of those creators of the dangerous condition are the source of the danger in the present case. Nor is this a case in which some underlying defect existed in the property, such as the floor, that contributed to the injury or in which the property owner took any affirmative action that contributed to creating the danger.  To the contrary, Mr. Fulghum wholly created the dangerous condition that caused his injury.  Furthermore, not only did Mr. Fulghum create the dangerous condition, he also had superior knowledge over Mr. Notestine as to the condition that had been created and the dangerousness thereof.

We have not uncovered nor have we been directed by Mr. Fulghum to any successfully maintained premises liability case in Tennessee or any other jurisdiction in which a plaintiff is wholly responsible for the creation of the dangerous condition that resulted in his or her injury and had superior knowledge as to the dangerousness of the condition over the property owner.  This is unsurprising given that, as noted by the Tennessee Supreme Court, "[l]iability in premises liability cases stems from superior knowledge of the condition of the premises." *Blair v. W. Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004) (quoting *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980)).  Courts have rejected premises liability claims where the plaintiff is the one that creates the dangerous condition and has knowledge thereof.  *See Howard v. R.M. Smith Invs., L.P.*, 228 So. 3d 937, 941 (Miss. Ct. App. 2017) (concluding in a premises liability case that "no duty to warn is owed to an invitee, licensee, or trespasser if the dangerous situation was one she created herself and was such that she was well aware of its presence"); *Collins v. Herman Nut & Supply Co.*, 240 N.W.2d 32, 35 (Neb. 1976) (upholding a directed verdict in a premises liability case where the plaintiff, not the defendant, created the dangerous condition and there was no evidence that the plaintiff was unaware of the condition or that the premises owner had superior knowledge over the plaintiff in connection with the dangerous condition); *see also Knight v. Waltman*, 774 So. 2d 731, 733 (Fla. Dist. Ct. App.

---

[9] *See, e.g., Perez v. McConkey*, 872 S.W.2d 897, 899 (Tenn. 1994) (printing room equipment); *Rice v. Sabir*, 979 S.W.2d 305, 307 (Tenn. 1998) (roof); *Eaton*, 891 S.W.2d at 588–90 (unlit home stairs); *McCormick*, 594 S.W.2d at 386 (defective barn loft); *Estate of Smith*, 670 S.W.3d at 309-10 (tree branches trimmed by maintenance staff); *Friedenstab v. Short*, 174 S.W.3d 217, 218 (Tenn. Ct. App. 2004) (steep home stairs); *Smid v. St. Thomas Hosp.*, 883 S.W.2d 632, 634 (Tenn. Ct. App. 1994) (hospital exercise equipment); *Lunsford v. K-VA-T Food Stores, Inc.*, No. E2019-01272-COA-R3-CV, 2020 WL 1527002, at *1–2 (Tenn. Ct. App. Mar. 31, 2020) (in-store scale); *Hunter v. Kroger Ltd. P'ship I*, No. W2017-01789-COA-R3-CV, 2018 WL 5793562, at *1 (Tenn. Ct. App. Nov. 5, 2018) (wooden pallet left on ground).

[10] *See, e.g., W. Town Mall*, 130 S.W.3d at 762–63 (oil slicks from community buses); *Coln*, 966 S.W.2d at 37 (sidewalk deviation); *Green*, 398 S.W.3d at 174 (steel post pre-dating owner); *Johnson*, 837 S.W.2d at 63 (contractor-created "excavation").

[11] *See, e.g.,* Goumas v. Mayse, No. 2013-01555-COA-R3CV, 2014 WL 1713195, at *8-9 (Tenn. Ct. App. Apr. 29, 2014) (rock on driveway).

2000) (footnote omitted) (indicating with regard to premises liability that "an invitee cannot recover from a landowner based on the failure to warn of a danger on the property when the invitee's knowledge of the danger is equal to or superior to the landowner's knowledge").

We decline to extend the tort of premises liability as far the Plaintiff in the present case would have it reach. A premises owner has no duty to warn as to a dangerous condition wholly created by a plaintiff, where neither the condition of the property itself nor an affirmative act of the property owner himself or herself contributes to creating the danger, and where the plaintiff has superior knowledge in comparison to the property owner. Accordingly, we conclude that the trial court did not err in determining that Mr. Notestine had no duty in the present case, and the issues related to whether he may raise a defense of comparative fault are, therefore, pretermitted.

## IV.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the Circuit Court for Rutherford County. Costs of the appeal are taxed to the appellant, Cory Fulghum, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____
JEFFREY USMAN, JUDGE